, CLASSIC PRODUCTS CORPORATION

v.

Stanley LEWICKI D/B/A American
Poly-Seal Co. and American
Poly-Seal Co., Inc.

Civ. A. No. 79–3292.

United States District Court,
E. D. Pennsylvania.

June 22, 1981.

Barry R. Elson, Philadelphia, Pa., Howard L. Bernstein, Washington, D. C., for plaintiff.

E. Arthur Thompson, Philadelphia, Pa., R. Douglas Lyon, Los Angeles, Cal., for defendants.

## OPINION AND ORDER

BECHTLE, District Judge.

### FINDINGS OF FACT

1. Plaintiff is Classic Products Corporation ("Classic"), a manufacturer of waterbed mattresses.

2. Defendants are Stanley J. Lewicki ("Lewicki"), an individual, formerly doing business as American Poly-Seal Co., and American Poly-Seal Co., Inc. ("American"), a corporation to which Lewicki transferred his proprietorship assets. At all times relevant to this action, both defendants are or were manufacturers of waterbeds.

3. A waterbed consists of a frame and a mattress. The frame has a floor and sides, and is often made of wood. The mattress, in its simplest form, consists of two pieces of soft, pliable vinyl which are sealed together along their edges to form a watertight container. With the mattress lying within the frame, water is introduced through a valve to fill the mattress. The frame thus serves to contain as well as to support the mattress.

4. A simple waterbed mattress as described above possesses an undesirable characteristic: a force applied to the mattress, such as when a person sits or moves on the bed, creates an uncomfortable wave motion throughout the bed, which can last for as long as 12 seconds. [N.T. 2–27/3 to 2–27/4; 2–140/19 to 2–140/20; 3–17/14 to 3–17/20].

5. Another problem associated with waterbed mattresses generally is the danger of leaks forming at the "seams" where pieces of vinyl are sealed together. The seams are particularly susceptible to the stresses created by persons sitting or moving on the bed which causes the water within the mattress to move. [N.T. 1–46/1 to 1–46/8].

6. The "baffle mattress," in its various forms, represents one approach taken in an attempt to reduce the wave motion in waterbeds. A baffle mattress consists of an ordinary waterbed mattress with the addi-

tion of one or more barriers constructed within the body of the mattress to impede the movement of waves through the mattress. [N.T. 3–20/12 to 3–26/13]. The barriers usually consist of one or more pieces of vinyl, sealed to the top or bottom of the mattress, or both, in any of a variety of configurations. [*See, e. g.*, N.T. 1–55/12 to 1–55/17; 1–57/3 to 1–57/8].

7. On March 27, 1979, the United States Patent Office issued Patent No. 4,145,780 ("the '780 patent") to Isaac Fogel covering a "waterbed assembly." Claim 9 of the '780 patent embodies a description of the baffle device to be included within the mattress of the waterbed assembly covered in the '780 patent: "a baffle dampener means . . . being affixed to the bottom sheet of said waterbed mattress and having flotation [sic] means for extending said baffle dampener means vertically to maintain a substantially constant wiping contact with the top wall of said waterbed mattress." [Exh. P–D, col. 8, 11. 27–33].

8. On May 8, 1979, the United States Patent Office issued Patent No. 4,152,796 ("the '796 patent") to Isaac Fogel covering a "waterbed mattress." Claims 2, 3, 7 and 8 of the '796 patent all incorporate claim 1 by reference. Claim 1 of the '796 patent embodies a description of the baffle device to be included within the waterbed mattress, as follows: "a plurality baffle dampener means in said waterbed mattress . . . being affixed to the interior surface of the bottom sheet and having floatation means for extending said baffle dampener means vertically, said baffle dampener means being positioned in said waterbed mattress to prevent continuous water wave action." [Exh. P–A, col. 4, 11. 41–47].

9. Isaac Fogel subsequently assigned the '780 patent and the '796 patent to the plaintiff, Classic, the present holder of the patents. [Exh. P–F].

10. Defendant, American, manufactures the "Wave-Tamer" waterbed mattress. [N.T. 1–2/15 to 1–2/20]. The "Wave-Tamer" consists of top and bottom sheets of translucent blue vinyl sealed together along their edges. Inside the envelope or contain-

er thus formed are 8 baffles. The "Wave-Tamer" baffles consist of rectangular pieces of vinyl, 10 inches high, sealed to the interior surface of the bottom sheet of the mattress in straight lines running the length of the mattress. Each pair of baffles is then connected by a horizontally-positioned rectangular sheet of plastic foam which floats to the top and holds the rectangular vinyl pieces upright. Since the average waterbed frame is about 9 inches high, the plastic foam would make contact with the top piece of vinyl. [N.T. 1–2/15 to 1–8/14; Exh. P–1].

11. The baffle mechanism employed in the "Wave-Tamer" is identical in all material respects to that embodied in the enumerated claims of the '780 and '796 patents, in that the baffles are constructed in both cases of pieces of vinyl sealed to the interior surface of the bottom piece of the mattress and held upright in the mattress by means of plastic foam.

12. At the time of the application for and issuance of the '780 patent and the '796 patent, the prior art included the following:

a. The Labianco patent: Patent No. 3,840,921, issued October 15, 1974 to Richard A. Labianco, is a patent covering a "fluid filled mattress" which numbers among its elements a baffle consisting of a rectangular piece of vinyl sealed to the interior surfaces of the top and bottom of the mattress to form a vertical barrier to wave-motion within the mattress. [Exh. D–3].

b. The Carson patent: Patent No. 3,736,604, issued June 5, 1973 to Robert N. Carson, Jr., is a patent covering "a water bed and support therefor" which numbers among its elements a baffle consisting of a piece of vinyl inside the mattress, sealed only to the interior surface of the mattress's top piece of vinyl, and weighted so as to hang down to the bottom piece of the mattress to form a vertical barrier to wave-motion within the mattress. [Exh. D–2].

13. The differences between the prior art and the patented device are as follows:

a. The devices embodied in the enumerated claims of the '780 and the '796 patents differ from the devices embodied in the Labianco patent in having their baffle member or members sealed only to *one* of the two outer vinyl pieces of the mattress, to wit, the bottom piece. By thus eliminating a seam, the devices embodied in the enumerated claims of the '780 and '796 patents eliminate a potential point of stress, and eventual tearing and leakage. [*See* Exhs. A, D & D–3].

b. The devices embodied in the enumerated claims of the '780 and '796 patents differ from the device embodied in the Carson patent in having their baffle member or members sealed only to the bottom outer piece of vinyl and floated to the top to obtain full extension, rather than having its baffle member sealed only to the top piece of vinyl and weighted to the bottom. [See Exhs. A, D & D–2].

14. The level of skill in the art of waterbed design is elementary, represented by persons with general high school or college educations, but without any specialized training in any field conceivably related to waterbed design or manufacture. [N.T. 1–48/8 to 1–48/16; 2–18/8 to 2–18/11]. Those engaged in the art can be described as imaginative entrepreneurs, seeking to improve the quality or marketability of their products through the straightforward application of fundamental physical principles. The product with which they are concerned, the waterbed, is correspondingly simple, requiring no more than an elementary school education to understand. Charles Hall, who testified as an expert on behalf of the defendants, does not represent the level of ordinary skill in the art, but on the contrary, possesses education and training beyond that possessed by the average person in the art. [See N.T. 2–126/24 to 2–127/12; Exh. D–31].

## DISCUSSION

In the present cases, plaintiff, Classic, seeks to recover damages from defendants, American and Stanley Lewicki, for the alleged infringement of two patents held by Classic on baffle-type waterbed mattresses. Defendants deny any infringement and assert that the patents are invalid, either as obvious in light of prior art or as anticipated by prior art. In addition, both plaintiff and defendants seek attorneys' fees under 35 U.S.C. § 285.

Upon consideration of a comparison of the language of the '780 and '796 patents with the "Wave-Tamer" mattress manufactured by American, as assisted by the testimony of Isaac Fogel, the Court has little difficulty in concluding that, if valid, the '780 and '796 patents are infringed by the "Wave-Tamer." In using baffles constructed of vinyl walls sealed to the bottom piece of the mattress and held upright by floating pieces of plastic foam, the "Wave-Tamer" employs precisely the mechanism embodied in the '780 and '796 patents.

Every patent, and every claim within a patent, is presumed valid. 35 U.S.C. § 282. In light of prior art, however, the device embodied in claim 1 of the '780 patent and claims 1, 2, 3, 7 and 8 of the '796 patent is obvious, and the patents are therefore invalid under 35 U.S.C. § 103. *See, Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The only difference of possible significance between the '780 and '796 patents and the Labianco and Carson patents is that the '780 and '796 patents provide for a baffle sealed to the bottom piece and floated to the top, rather than sealed to the top and hung to the bottom, as in Carson, or sealed to both top and bottom, as in Labianco. The question is whether, in light of the level of ordinary skill in the art, this difference is so great or significant as to render the devices embodied in the '780 and '796 patents non-obvious. *See,* 35 U.S.C. § 103; *Graham v. John Deere Co., supra,* at 17, 86 S.Ct. at 693. It is true that those engaged in the art of waterbed design generally do not have, nor do they need, any formal, specialized training or education, and know what they do about their field simply through experience. Nevertheless, there is nothing complex about the

product itself, and the concepts underlying the design of the baffle incorporated in the '780 and '796 patents require nothing more than an understanding of the most primitive principles of bouyancy in water— namely, that a piece of lightweight material, lying in water and attached to the bottom of the container, can be made to stand up in the water by attaching it to something that floats and has a bouyancy force greater than the force of gravity on the material to be raised. In the Court's view, this is obvious within the meaning of 35 U.S.C. § 103.

Since the Court has determined that the patent is invalid as obvious, it need not address defendants' contention that the '780 and '796 patents were anticipated by prior art.

The Court has also concluded that the facts of this case do not warrant granting attorneys' fees to either party under 35 U.S.C. § 285. Classic's patents were not so clearly invalid on grounds of obviousness or anticipation as to lead the Court to conclude that Classic brought this action fraudulently or in bad faith, nor were defendants able to bring forth sufficient evidence to support their claim that Classic knew of the patents' invalidity.

In conclusion, the Court finds that, while American's "Wave-Tamer" does infringe upon the '780 and '796 patents held by Classic, the patents infringed are invalid under 35 U.S.C. § 103. An appropriate Order will be entered.

### CONCLUSIONS OF LAW

1. Jurisdiction exists pursuant to 28 U.S.C. § 1338(a).

2. Defendant American's "Wave-Tamer" mattress infringes upon plaintiff Classic's '780 patent in respect to claim 1, and upon plaintiff Classic's '796 patent in respect to claims 1, 2, 3, 7 and 8.

3. Both the '780 patent and the '796 patent are invalid under 35 U.S.C. § 103 as obvious in light of prior art.

4. The present case is not an extraordinary case warranting the award of attorneys' fees to either plaintiff or defendants under 35 U.S.C. § 285.